# Birdie Wilkins v. The State.

No. 19156.   Delivered December 8, 1937.
Rehearing denied April 27, 1938.

The opinion states the case.

*Roy A. Scott*, of Corpus Christi, for appellant.

*Leo Brewster*, Assistant District Attorney, of Fort Worth, and *Lloyd W. Davidson*, State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is accomplice to murder; the punishment, confinement in the penitentiary for 25 years.

The indictment alleged that Luther Edgar Sumrall was the principal. The State introduced in evidence Sumrall's confession in which he admitted that he placed deceased, who was the husband of appellant, upon a railroad track where he was killed by a train. Appellant's confession was to the effect that she promised to pay Sumrall part of the proceeds of an insurance policy on the life of deceased to induce him to commit the homicide. Some of the witnesses for the State testified that some time prior to the homicide appellant had requested them to kill deceased.

Testifying in her own behalf, appellant repudiated her confession and declared that the officers had coerced her to make it. Further, she denied that she had any connection with the homicide.

The testimony of the officers was to the effect that they had in no manner mistreated appellant. In short, according to their version, the confession was voluntary.

As already pointed out, in her confession appellant admitted her guilt. Upon the trial she denied that she was in any manner connected with the homicide and declared that her confession had been coerced. The question whether the confession was voluntary was submitted in the charge. The only direct evidence in the record connecting appellant with the commission of the homicide as an accomplice came from the confession. Appellant excepted to the charge of the court as follows: "The defendant further excepts and objects to the court's main charge because nowhere in said charge does the court instruct the jury upon the law of circumstantial evidence."

It is observed that nowhere in the exception was the trial court advised that appellant sought to have the jury instructed that in the event they rejected the confession, the State relied upon circumstantial evidence. In the state of the record we deem the exception to have been too general. It might be added that a similar situation was presented in Johnson v. State, 197 S. W. 995. In that case the Court reached the conclusion that a charge on circumstantial evidence was not required. However, in view of the fact that we hold the exception to have been insufficient, it is deemed unnecessary to determine whether the announcement in Johnson's Case should receive our approval. See Snow v. State, 291 S. W. 558.

It appears from bills of exception 11 and 12 that Tony Garcia, a witness for the State, was permitted to testify, over appellant's objection, that he had married the appellant in 1932 and was later divorced from her. It is observed that appellant testified on cross-examination, without objection, that she had been married to Tony Garcia prior to the time she married deceased. Under the circumstances, appellant is in no position to complain. We quote from 4 Tex. Jur., page 587, as follows: "It is a general rule also that the admission of improper evidence does not constitute reversible error if the same facts were proved by other and proper testimony or by evidence which was not objected to, as where the accused voluntarily gave testimony substantially the same as that erroneously received over objection."

In support of the text many authorities are cited, among them being Enix v. State, 16 S. W. (2d) 818.

In her motion for new trial appellant alleged that the jury were guilty of misconduct in discussing new and additional evidence. The bill of exception bringing forward the testimony adduced upon the motion for new trial recites that the court heard the testimony of three members of the jury. The bill embraces the testimony of only two members of the jury. In

this situation we must indulge the presumption that the juror whose testimony has not been brought forward denied that the misconduct in question occurred; and that the trial judge acted upon sufficient evidence in overruling the motion for new trial.

It is shown in bill of exception 27 that counsel for the State, in his closing argument, stated to the jury, in substance, that every insurance policy he had seen had carried a double indemnity clause to cover death by accident. Appellant's objection to the argument was sustained and the jury instructed not to consider same for any purpose. Continuing his argument, counsel for the State then stated to the jury that if the policy had carried a double indemnity clause appellant would have received an additional thousand dollars. Appellant again objected and the objection was overruled. It appears that after the death of deceased appellant had assigned a policy for one thousand dollars on the life of her husband to the undertaker for the purpose of securing the payment of the funeral expenses. Counsel for appellant had argued to the jury that after deducting four hundred dollars—the amount of the funeral expenses—from the proceeds of the policy there would have been only six hundred dollars left for division between Sumrall, the alleged principal, and appellant. It appears that the insurance policy had not been introduced in evidence and there was no proof that it contained a double indemnity clause. In view of the fact that the court instructed the jury to disregard the statement of the district attorney that every insurance policy he had seen carried a double indemnity clause, we are of opinion that the statement alone that appellant could have collected an additional thousand dollars if the policy contained such clause is not of sufficient materiality to warrant a reversal of the judgment of conviction.

Bill of exception No. 1 relates to appellant's contention that the special venire was not drawn in the presence of the trial judge in accordance with Article 591, C. C. P. The bill of exception, as qualified, shows that the names were drawn in the presence of the trial judge by the clerk and that thereafter the cards bearing such names were carried in the office by the clerk and by him and a deputy clerk listed in the order in which they had been drawn. Appellant cites Avirett v. State, 84 S. W. (2d) 482, in support of her contention that reversible error is presented. In that case a reversal was not predicated upon the failure of the clerk to list the names in the presence of the trial judge. In view of the fact the bill of exception in the present case shows that the names were listed in the order in which they were drawn, and that appellant could have been in no

manner injured by the procedure followed, we are of opinion that reversible error is not presented.

In one of her bills of exception appellant complains of the action of the trial court in overruling her first application for a continuance. The court qualifies the bill to the effect that sufficient diligence was not shown and to the further effect that upon the motion for new trial the affidavit of the absent witness showing the testimony he would have given was not presented. We think the bill fails to reflect error.

Several bills of exception relate to appellant's objections to certain portions of the confession of the principal. This confession was available to fix the principal's guilt, and all of it necessary to connect him in an orderly way with the transaction was admissible. The fact that interwoven in such confession were expressions connecting the appellant with the acts of the principal, and which could not have been eliminated without rendering the confession incomplete and fragmentary, did not render same nonavailable to the State. Smith v. State, 91 Texas Crim. Rep. 15; Espalin v. State, 90 Texas Crim. Rep. 625. The court properly limited the purpose of the confession to establishing the principal's guilt. Smith v. State, supra.

An examination of appellant's contentions leads us to the conclusion that reversible error is not presented.

The judgment is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—The indictment alleged that Luther Edgar Sumrall with malice aforethought killed Arthur L. Wilkins by placing an automobile containing Wilkins on a railroad track so that he would be run over and killed by a railroad train, and that appellant prior to the commission of said offense with malice aforethought did "advise, command and encourage the said Luther Edgar Sumrall to commit said offense," the said appellant not being present when the offense was committed.

The confession of appellant was admitted in evidence. Unless said confession furnished direct evidence supporting the averments of the indictment as to appellant's connection with the killing of her husband no such direct evidence is in the record.

It was appellant's contention on original submission and is now on motion for rehearing, that her confession discloses no admission that she advised, commanded or encouraged Sumrall to kill her husband, and a conclusion that she did so must be arrived at by the process of inference or reasoning. Of course, if appellant is right in her contention the law of circumstantial evidence should have been charged. As this question must of necessity turn on the confession itself we here set same out, omitting the warning, which was in proper form.

"My name is Birdie Wilkins, I live at 2505 North Houston Street. I am now the wife of Arthur L. Wilkins who was killed by a Rock Island Passenger Train near the Universal Mills on Kings Highway early Sunday morning, October 25, 1936. I have known Oscar Clarkson for fourteen years and have known Luther Edgar Sumrall for about eleven years. Both of these men have been to our home on numerous occasions since my husband (Arthur Wilkins) and I have been married. I used to go with Oscar Clarkson when I was married to Mr. Wright, but was separated from Mr. Wright at the time and Oscar was separated from his wife. About two and one half years ago Oscar Clarkson was in the house when my husband was away and I was getting out the children's insurance policies to make payments on them and my husband Arthur Wilkins' insurance policy dropped to the floor and Oscar Clarkson picked it up and asked what it was and I told him that it was my husband's insurance policy. Oscar Clarkson looked at it and said it is for a thousand dollars, and I said yes, give it back to me. He handed it back to me and I put it back in the can. Oscar Clarkson said let me bump the old son of a bitch off and I said no, not for his insurance and he said we could get enough money out of it to go away and live together on it. He wanted to quit his wife anyway as he said he couldn't stand her or that bunch of kids. He later left the house. He mentioned about bumping off my husband every two or three days for two and one half years. (I knew what he meant by bumping off my husband that he meant to kill him.) About two months ago Luther Edgar Sumrall came to a beer tavern at 212 West 25th Street, where I was working and we were talking about Oscar Clarkson and how dirty he was and what a double crosser he was and I told Luther Edgar Sumrall about the proposition that Oscar Clarkson had made to me to kill my husband for his insurance. Luther Edgar Sumrall, whom I call Edgar said he was short of money and not to be a fool and let him do it. He said he needed the money worse than Oscar did. He said that Oscar was yellow and wouldn't go through with it anyway. He worried me for

two months about it. About two weeks ago Edgar Luther Sumrall came to my house and said he would put him on a railroad track and get him killed. He said he knew several different crossings that would be a good place, and to forget the $1000.00 insurance and if the railroad company paid off anything to give him half of it for putting my husband Arthur Wilkins on the railroad track so the train would kill him. At this time I said that I would think about it. Edgar said that he wouldn't have any certain time to do it, meaning to put my husband on the railroad track to be killed. Edgar came back two or three days later and asked me if I was ready to take up his proposition and I told him well alright, but I did not know that he intended to do it Saturday night. As he had said before that he didn't have any set time to do it. Last Saturday night, October 24, 1936, Edgar Sumrall came to our house about dusk and my husband and I were at a beer tavern at 212 N. W. 25th Street drinking Coco Cola and my little boy Toney came in and said that Edgar was at the house and we went back to the house and I cooked supper. Edgar, my husband and little boy all ate supper. We all sat around and talked for about one and one half or two hours. Then Edgar said he had to go home, so they (Edgar and my husband) got in my husband's car, which was a blue Buick coupe, 1931 Model and left. They said that they were going to take Edgar home. My husband told me good-bye and said that he would be back in an hour and one half. Then we were going to town, but he never came back. I pulled off my shoes and hose and laid down across the bed until Mr. Lucas of the Riverside Funeral Home came to my house about 1:15 A. M., October 25, 1936, and told me that my husband had happened to an accident and I asked him what kind of an accident and he said that a Rock Island Passenger Train had hit him and I asked him if he was seriously hurt and he said that he was hurt pretty bad and I asked him if he was dead and he said yes. When Mr. Lucas told me about the train killing my husband it came into my mind that Edgar had probably carried out his plans and placed my husband on the railroad track so that the train would kill him. But I wasn't sure until I talked with him the next morning. Edgar lied to me when I went by his house about 10:00 A. M. after I had gone to the Funeral Home in Riverside. Edgar told me that my husband had taken him straight home the night before and that he had gone to bed, and I also asked him if they had bought any drinks after they had left the house and he told me that they had not. I did not take poison as my neighbors said I did, but just after Mr. Lucas left I was inhaling Chloroform to stop my headache and spilled

some on the bed and had inhaled enough to put me to sleep. One of my neighbors came in and sent me to hospital. This neighbor Hazle Miles said she heard me gasping for breath and I had the bottle in my hand. That is all that I know about the killing of my husband by a Rock Island Passenger train Sunday morning October 25, 1936. The officers arrested me about eleven A. M. the day that my husband was killed. I have read the above statement and it is true and correct. Signed October 27, 1936. (Signed) Birdie Wilkins."

We are unable to follow the refinement of reasoning from which counsel for appellant assumes that it is only by inference from statements in said confession that the conclusion may be reached that appellant encouraged Sumrall to bring about her husband's death. It appears from her positive statements therein that every two or three days for more than two years Clarkson had talked to her about killing her husband to get the insurance on his life; that about two months before he was killed she told Sumrall about Clarkson's proposition, and Sumrall insisted that she let him and not Clarkson do the job; that Sumrall "worried" her for two months about it; that about two weeks before the killing Sumrall disclosed his plan to have her husband killed by a train on the railroad track and told her to forget the $1,000.00 insurance and if the railroad company paid off anything to give him half of it "for putting my husband Arthur Wilkins on the railroad track so the train would kill him." Appellant did not accept Sumrall's proposition at once but took it under advisement; two or three days later when Sumrall asked if she was ready to accept his proposition she told him "Well, all right." The confession shows positively—without conclusions or inferences—that appellant entered into a contract with Sumrall that he should have her husband killed by the railroad train, and if she collected anything from the railroad she would give half of it to Sumrall. His proposition had been under consideration by her for two months, and was finally accepted. If this does not establish by direct evidence that she "encouraged" Sumrall to kill her husband then we confess our inability to construe the meaning of plain language.

From what has been said it follows that we do not regard the case as one in which the State was dependent on circumstantial evidence alone, hence no instruction upon that subject was called for.

Although it was made an issue as to whether appellant's confession was voluntary and such issue was submitted to the jury it was not necessary to charge on circumstantial evidence. See

460

Wilson v. State, 103 Texas Crim. Rep. 403, 281 S. W. 844; Langhorn v. State, 105 Texas Crim. Rep. 470, 289 S. W. 57; Simmons v. State, 107 Texas Crim. Rep. 504, 296 S. W. 513; Dyer v. State, 105 Texas Crim. Rep. 374, 288 S. W. 230; Snow v. State, 106 Texas Crim. Rep. 222, 291 S. W. 558; Johnson v. State, 197 S. W. 995.

The other points urged in appellant's motion for rehearing which were considered in our original opinion do not appear to demand further discussion.

Our attention is called to bills of exception numbers fourteen and twenty-eight, which were not considered in detail on original submission. From a re-examination of said bills it is not thought necessary to now discuss them. It is not believed any reversible error is presented by either bill.

The motion for rehearing is overruled.